BETTS v. UNITED STATES. |

(Circuit Court of Appeals, First Circuit. August 25, 1904.)

No. 512.

1. CRIMINAL LAW—APPEAL—ASSIGNMENTS OF ERROR.

Assignments of error, stated in general terms, and which are discussed in the brief of plaintiff in error in such general language as to cast upon the court the burden of searching the record to ascertain the precise propositions of law relied on and the facts which render them applicable, will, ordinarily, not be considered.

2. SAME—REQUESTS TO CHARGE.

Peremptory requests to charge, based upon a partial statement of the facts, or which are not properly qualified to render them applicable to the facts shown in evidence, are ineffectual to sustain assignments of error based on their refusal, and will not be considered by the appellate court unless in exceptional cases.

3. POST OFFICE—USE OF MAILS TO DEFRAUD.

Issues, evidence, and instructions considered in a prosecution based on Rev. St. § 5480, as amended by Act March 2, 1889, c. 393, § 1, 25 Stat. 873 [U. S. Comp. St. 1901, p. 3696], for fraudulent use of the mails.

4. SAME—PROSECUTION—EFFECT OF ORDER FOR TRIAL OF INDICTMENTS TOGETHER.

Rev. St. § 5480, as amended in Act March 2, 1889, c. 393, § 1, 25 Stat. 873 [U. S. Comp St. 1901, p. 3696], making the use of the mails to defraud a criminal offense, provides that an indictment thereunder may charge offenses to the number of three when committed within the same six calendar months, but the court thereupon shall give a single sentence. Rev. St. § 921, [U. S. Comp. St. 1901, p. 686], provides that a court of the United States, when causes of a like nature or relative to the same question are pending before it, may "make such orders or rules concerning the proceedings therein as may be conformable to the usages of courts for avoiding unnecessary costs or delay, * * * and may consolidate such causes when it appears reasonable to do so." Nine indictments were returned against defendant under said section 5480 [U. S. Comp. St. 1901, p. 3696], each containing three counts, all relating to the same alleged scheme to defraud, but charging different mailings, all within the same six calendar months. The record showed that "by order of the court the said nine indictments were tried together and at the same time, and upon each of the said nine indictments separate verdicts were rendered," and separate sentences were imposed under the several indictments. *Held,* that the indictments were not consolidated, which would, in effect, defeat the implied prohibition against joining more than three offenses in the same indictment, and that the only effect of the order was that all the indictments should be tried together to the same jury, leaving each party with the same material rights as though tried separately.

5. JURY—PEREMPTORY CHALLENGES—EFFECT OF TRIAL OF INDICTMENTS TOGETHER.

That a number of indictments against the same defendant under Rev. St. § 5480 [U. S. Comp. St. 1901, p. 3696], for using the mails to defraud, are by order of the court tried together to the same jury, does not affect the right under Rev. St. § 819 [U. S. Comp. St. 1901, p. 629], to three peremptory challenges for each indictment.

Aldrich, District Judge, dissenting.

In Error to the District Court of the United States for the District of Massachusetts.

¶ 1. See Criminal Law, vol. 15, Cent. Dig. § 2957.

Charles W. Bartlett and Harvey H. Pratt, for plaintiff in error.

Henry P. Moulton, U. S. Atty., and William H. Lewis, Asst. U. S. Atty.

Before HOLMES, Circuit Justice, PUTNAM, Circuit Judge, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. Nine indictments were returned in the Circuit Court for the District of Massachusetts at the September term, 1901, against the plaintiff in error and one Fisher, under section 5480 of the Revised Statutes, as amended by Act March 2, 1889, c. 393, § 1, 25 Stat. 873 [U. S. Comp. St. 1901, p. 3696], which indictments were remitted to the District Court for the same district, and proceeded on to judgment. One indictment appears at large in the record before us. It contains three counts. We also understand that each of the other indictments contains three counts, and that all the offenses charged in all were within the same six calendar months. The indictments and all the counts relate to the same "scheme and artifice to defraud," and the only difference between the several counts in the several indictments is that each shows a separate mailing. The statute provides that on conviction, punishment shall be imposed "by a fine of not more than five hundred dollars and by imprisonment for not more than eighteen months, or by both such punishments, at the discretion of the court." It also provides as follows:

"The indictment, information, or complaint, may severally charge offences to the number of three when committed within the same six calendar months; but the court thereupon shall give a single sentence, and shall proportion the punishment especially to the degree in which the abuse of the post-office establishment enters as an instrument into such fraudulent scheme and device."

Section 921 of the Revised Statutes [U. S. Comp. St. 1901, p. 686], provides:

"When causes of a like nature or relative to the same question are pending before a court of the United States, or of any territory, the court may make such orders and rules concerning the proceedings therein as may be conformable to the usages of courts for avoiding unnecessary costs or delay in the administration of justice, and may consolidate said causes when it appears reasonable to do so."

Section 819 of the Revised Statutes [U. S. Comp. St. 1901, p. 629], after providing for challenges in cases of treason, other capital offenses, and other felonies, proceeds:

"And in all other cases, civil and criminal, each party shall be entitled to three peremptory challenges; and in all cases where there are several defendants or several plaintiffs, the parties on each side shall be deemed a single party for the purposes of all challenges under this section."

The record discloses the following:

"The defendants were severally ordered to proceed to, and were placed upon, trial on said nine indictments, and subsequently separate verdicts of guilty on each indictment were rendered against the defendant Betts."

And again:

"By order of the court, the said nine indictments were tried together and at the same time, and upon each of said nine indictments separate verdicts were rendered."

No objection was made to these orders. They are assumed to have been entered pursuant to that portion of section 921 of the Revised Statutes which authorizes orders for avoiding unnecessary costs or delay. Plainly, the indictments were not consolidated, because the record shows that there were separate verdicts and cumulative sentences, so that each proceeding retained its identity. The entire effect of the order was only that the various indictments were tried together by the same jury.

During the progress of the trial Fisher pleaded guilty. The record also contains the following:

"In the impaneling of the jury the defendant Betts challenged Jurymen Goodnough, Hall, and Sears. Before Juryman Tobey was sworn, he challenged him, claiming that he had a right to twenty-seven arbitrary challenges. The government objected. The challenge was disallowed, and the defendant Betts duly excepted."

The nature of the fraudulent scheme alleged against Betts and Fisher, and the substance of the case in reference thereto, are shown sufficiently by the following extract from indictment 1:

"The jurors for the United States of America, within and for the district of Massachusetts, upon their oath, present that before and at the time of the commission of the offence hereinafter charged, John M. Fisher and Frederick E. Betts did intend to devise and did devise a scheme and artifice to defraud, which scheme and artifice to defraud was as follows, that is to say, that they should falsely pretend and represent to divers persons with whom they should communicate that they, said Fisher and Betts, were engaged in carrying on a regular banking and brokerage business at Boston in the District of Massachusetts, and that they should by published advertisements and by communications through the United States mails falsely pretend and represent to the public and to persons to whom they should send circulars and letters that they, said Fisher and Betts, were engaged with a large New York firm in the business of manipulating stocks, that is to say, in the business of buying stocks and using means to enhance the prices and market value of stocks so bought, and when said stocks should have reached a higher price so that a profit over the purchase price could be had, selling said stocks for the benefit of persons who should entrust them, said Fisher and Betts, with money to pay a part or the whole of the purchase price thereof; that for the purpose of buying and selling stocks and manipulating them as aforesaid, a pool or special deal would be formed to buy and sell a certain stock listed on the New York Exchange to the purchase of which said listed stock by means of said pool or special deal the persons to whom the circulars and letters aforesaid should be sent would be asked and urged by them, said Fisher and Betts, to contribute money, and for the purpose of effecting the purchase of said listed stock, to pay over money to them, the said Fisher and Betts; whereas in truth and in fact they, said Fisher and Betts, were not engaged in carrying on a regular banking and brokerage business at said Boston or elsewhere; and whereas in truth and in fact they, said Fisher and Betts, were not engaged with any New York firm in the business of manipulating stocks, and that they, the said Fisher and Betts, did not intend to be in any way connected with any pool or special deal to be formed to buy and sell any stock listed on the New York Exchange, and no such pool or special deal had been formed or would be formed; all of which they, the said Fisher and Betts, at all the times aforesaid well knew; with the view and intent of them, said Fisher and Betts, to obtain and get into their hands and possession money and property of such persons as might entrust money and property to them for the purchase of stocks by means of a pool or special deal as aforesaid, and to convert the same to their, said Fisher and Betts', own use and benefit, without purchasing any stocks whatever and to cheat and defraud such persons as might entrust money and property to them, said Fisher and Betts, for the purchase of stocks out of the money so entrusted."

Although there were nine indictments and nine judgments, we have here only one writ of error. No question has been made on that score, and we refer to it only in order that we may not be assumed to acquiesce in this method of procedure. Betts filed a motion to quash, containing a large number of specifications, which was overruled, and on which overruling a bill of exceptions was allowed. The law is settled that, with exceptional cases, where the federal courts have conformed themselves to the ancient local practice, error does not lie to the overruling of such a motion. United States v. Gooding, 12 Wheat. 460, 478, 6 L. Ed. 693, and many subsequent decisions of the Supreme Court. We, however, pass that by, because the objections made to the indictments on the motion to quash are mainly of that class which, if valid, would not be cured by verdict, and therefore may be assigned for error independently of any demurrer or motion in arrest of judgment.

The number of errors formally assigned in this record is 37, but, in view of the fact that some of the errors thus assigned cover numerous distinct propositions, a proper enumeration would be 58. Following these through into the brief for the plaintiff in error, we find a number discussed in the following manner:

"The court should have given apt instructions concerning the requests stated in the twenty-first, twenty-second, twenty-third, and twenty-fourth assignments of error. It appeared in evidence (record, page 16) that some of the witnesses called by the government knew that they were speculating in the stock market. Other witnesses called by the defendant (record, pages 68 and 69) distinctly stated that they bought and sold stocks upon margin. There was such evidence in the case that the jury might well have found concerning some of the counts in the indictments that the defendant was not guilty, had the trial court given the substance of these requests."

This is all that is said about these four alleged errors. It is apparent that this throws upon the court the burden of searching out the law and the record, and of putting together the several portions of the latter for the purpose of sifting out the propositions on which the plaintiff in error relies, whatever they may be. This is a burden which the court will not assume. An example of another class which may also be passed by us is found in the thirty-first error assigned, as follows:

"That said District Court erred in not instructing the jury, as requested, that, if they were satisfied that the defendant Betts was in the business of receiving money and paying it out with interest, or receiving money and investing it in stock for his customers, he could not be convicted."

This is one of the class of peremptory requests of which others are found in the record, which are clearly ineffectual because unqualified. Why requests of this class are not to be considered, unless under exceptional circumstances of apparent and substantial injustice, is fully explained by us in McQueen v. Kondelin, 127 Fed. 76, 61 C. C. A. 650.

Several errors are assigned relating to the requested instructions to the jury based on the hypothesis that, in order to convict, the United States were required to prove that everything which the plaintiff in error was charged with having pretended was falsely pretended. That this is not the law with reference to indictments of this character is such a fundamental proposition that we need not notice such alleged errors. A considerable portion of the case is based on the claims that

the statute sounds in false pretenses as understood at common law, and that the indictments should disclose the name of some person intended to be deceived, and also on the further claim that the United States should prove that somebody was in fact defrauded. The entire line of authorities with reference to the statute in question is so at odds with those propositions that we easily lay them aside.

What we have said disposes of all the points made by the plaintiff in error, except some others so clearly insufficient that we do not deem it necessary to allude to them, and except those to which we will now call attention. It will be noticed that one of the allegations in the indictment is that the plaintiff in error and Fisher, who were partners under the style of J. M. Fisher & Co., falsely pretended that they were carrying on a regular banking and brokerage business. This, of course, raised an issue calling on Betts to meet the evidence offered by the United States in regard thereto by proper proofs that he and Fisher were in fact so engaged. Thereupon Betts offered to show by officers of banking institutions in Boston that within certain dates named sums aggregating a large amount of money were paid by J. M. Fisher & Co. out of their deposits to many customers, appearing by checks drawn by them, which customers he further proposed to show, in many instances, identified themselves to the banking institutions by producing statements of stock dealings and accounts received from J. M. Fisher & Co., accompanying the checks presented for payment. For the same purpose, in order to establish that a large number of customers had purchased and sold through them various stocks and commodities, he offered to prove by one in the employment of J. M. Fisher & Co. that the witness had drawn checks to these customers, and that the checks came back through the clearing house properly indorsed. The difficulty with this class of proof is that, of itself, in the absence of any expressed purpose to show the transactions out of which the checks arose by persons who knew about them of their proper knowledge, the evidence offered was entirely ineffectual. If Betts and Fisher were in fact engaged in a proper banking and brokerage business, there must have been persons in their employment who knew it. Therefore the court could justly conclude that the offer of such scraps of evidence as we have referred to could have had no purpose except to mislead and confuse, however valuable they might have been in fortifying a case resting in whole or in part on proper proofs of a direct and fundamental character. The court was not only justified in rejecting this evidence, but in the performance of its obligation to protect the case from confusion and from needlessly occupying its own time and the time of the jury it was in duty bound so to do.

An issue arose whether Betts and Fisher had caused to be purchased on the Consolidated Stock Exchange of New York certain securities, details of which need not be named. It became desirable on behalf of the United States to show that no bona fide transactions of that character had actually occurred. It appears that Betts had represented that such dealings had been made through a broker by the name of Gwynne. Thereupon one Courtney was called by the United States, who testified that he was a clearance clerk at that exchange. He produced statements of transactions cleared there on certain days in question, and tes-

tified that the clearance sheets showed no purchases by Gwynne of the character asserted. This, of course, was not the proper way of supporting this issue on the part of the United States. It was three or four generations away from proof by parties having personal knowledge. As a preliminary fact, to be connected with others, it might have been admissible; but, standing alone, it might have tended to seriously prejudice the plaintiff in error. Fisher, however, testified that he and Betts employed Gwynne at a stated sum of $30 a week to render them statements showing fictitious sales and purchases, presumably designed to be used by them in imposing on their customers. No attempt was made to contradict or discredit Fisher on this point. Therefore it may well be said that this issue was so clearly proved in behalf of the United States that the testimony of Courtney could not in any way have prejudiced the plaintiff in error.

Of like dangerous character was the evidence admitted against the objection of Betts from a witness by the name of Adams, to the effect that he had addressed a letter to R. G. Dun & Co., inquiring with reference to the standing of Betts and his partner, Fisher. This grew out of the fact that in one communication received by Adams there was this postscript:

"References as to our financial and moral standing may be had by getting a special report on us from R. G. Dun & Company, or writing to the Bankers and Manufacturers Mercantile Agency of New York and Boston, 50 State street, Boston."

Adams applied to the Bankers' & Manufacturers' Mercantile Agency, and received a favorable report; but, on the theory of the United States, this so-called agency was a mere stool pigeon of Betts and Fisher. Thereupon, against the objection of Betts, Adams was allowed to testify that he wrote R. G. Dun & Co., and received an answer from them, but no report. A representative of R. G. Dun & Co. was subsequently called by the United States, and testified that Betts and Fisher, as partners, were subscribers to the Dun Agency, but that the agency did not make reports except to its subscribers. Thereupon Betts made a request for an instruction that under the circumstances the fact that Betts and Fisher referred to the two agencies named could not be taken into consideration as a part of the scheme or artifice to defraud. This request was, of course, too broad, because it covered both agencies. The court, however, said to the jury that the facts as to R. G. Dun & Co. did not appear to have any particular relevancy one way or the other, but it concluded on this point as follows: "You may attach to it such weight as you think best." It may be that the proper instruction as to the matter of R. G. Dun & Co. would have been that it had no relevancy. In view, however, of the extreme improbability that the jury could have regarded the matter as at all material, of the unusual number of points made by Betts according to the errors assigned as we·have stated, and of the omission in the requested instruction to distinguish between Dun & Co. and the other so-called agency, no exception on this account can be sustained.

Fisher testified that a few days prior to the arrest of himself and Betts they were in hiding. To overcome any inference of guilt to be drawn from this evidence, a witness called by Betts testified that he

was acting as Betts' attorney, and that whatever hiding there was was by his advice for a brief time while he was negotiating about bail. Betts claimed that this explanation robbed the hiding of any evil significance, and he asked for an instruction in reference to it as follows:

"If the jury shall find that the defendants, Betts and Fisher, concealed themselves between the 28th and 31st days of October, 1901, by advice of counsel, and for the purpose of enabling him to agree with the District Attorney upon the amount of bail, no inference can be drawn by the jury that such a concealment was flight or a confession of guilt."

Of course, this request was too positive, and the mere fact that it was not given would not afford a basis for an exception. The court, however, charged as follows:

"If a man runs away from an officer of justice, it may be taken into account against him as much or as little as the jury think, or ought fairly to think, it to be entitled to. The fact that he was seeking for bail during the time that he was away, and that he surrendered himself as soon as bail could be found for him, should be also taken into account in determining the motives of his absence and the weight which the mere fact of his absence has on the question of his guilt. These are questions for you to determine, gentlemen, as reasonable men, giving to them such weight as you think ought to be given to them."

The questionable portions of this instruction are covered by the words "as much or as little as the jury think," and "giving to them such weight as you think ought to be given to them." The effect of this repetition was to submit the entire topic to the jury without sufficient caution or explanation. The attorney's testimony was not questioned, and, while the requested instruction was too positive in form, yet his evidence left very little, if anything, of material consequence in the fact relied on by the United States, and the jury should have been cautioned accordingly. The Supreme Court has been very wary on this topic, although it never came before it in this form. Hickory v. United States, 160 U. S. 408, 16 Sup. Ct. 327, 40 L. Ed. 474; Alberty v. United States, 162 U. S. 499, 16 Sup. Ct. 864, 40 L. Ed. 1051; Starr v. United States, 164 U. S. 627, 17 Sup. Ct. 223, 41 L. Ed. 577. The rule in Allen v. United States, 164 U. S. 492, 498, 17 Sup. Ct. 154, 41 L. Ed. 528, is not applicable, because there was no attempted explanation as here.

The only other error assigned which requires consideration is with reference to the number of challenges to which Betts was entitled. It is first necessary to consider further the nature of the proceeding involved in the order of the court that the indictments should be "tried together and at the same time." We have said that under the circumstances this was not a consolidation in the proper sense of the word. The natural meaning and inherent force of the word "consolidation" are perfectly plain and irresistible, although it is known that in some of the authorities the word is used loosely. It has its place in proceedings in equity, or in admiralty, where several libels or petitions are, by authority of the court, combined into one, so that at the close only one decree is rendered. An example of this in admiralty is found in The North Star, 106 U. S. 17, 27, 1 Sup. Ct. 41, 27 L. Ed. 91, where unification by consolidation proper was clearly expressed. Beyond all question, no such consolidation could arise with reference to the present indictments, because otherwise the implied prohibition of the statute

on which they were based against combining in one indictment more than three offenses would be indirectly defeated. The result is that, as neither indictment lost its identity, the material rights of both parties as to each continued the same, unless so far as otherwise necessarily involved in the trial of all at the same time with the same jury, or unless so far as expressly provided by statute or necessarily implied from what the statute enacts. Accordingly, in Mutual Life Co. v. Hillmon, 145 U. S. 285, 293, 12 Sup. Ct. 909, 36 L. Ed. 706, in speaking of the statutes we are discussing, it naturally fell into the use of the following language: "No defendant could be deprived [meaning none could be deprived by an order for trying cases together], without its consent, of any right material to its defense, whether by way of challenge of jurors," etc. It is true that this broad language was not strictly essential to the case in which it was used, but the way in which the court fell into it illustrates strikingly that it is the natural construction to be given to the statutes in question. Therefore it rests on the United States to make it clear that this natural reading should not have full effect. With such reading the conclusion follows that, inasmuch as by the express language of section 819 of the Revised Statutes [U. S. Comp. St. 1901, p. 629] the plaintiff in error had a right to three peremptory challenges on each indictment if tried separately, this was a "right material" to his defense, not to be taken away merely because several indictments were submitted to the same jury at the same time. Not only is there no provision of the statute to the contrary, but there is nothing in the practical conditions of a joint trial which would justify the court in holding that the statute by implication necessarily deprived the plaintiff in error of the right claimed by him.

It is indisputable that the right to challenge peremptorily is a "right material" to the defense, as that expression is used in Mutual Life Company v. Hillmon. Indeed, it is among the most useful weapons of defense put in the hands of an accused person. It is the only method of cutting off underground, malevolent currents, visible at some times to no one except the accused and his counsel, and sometimes not even to both of them. Without its uncontrolled exercise, justice would be absolutely unobtainable in many cases. The greatest of all French novelists, writing with reference to some noblemen charged with violence towards a person who had acquired their confiscated estates at the period of the incipiency of the First Empire, pointed out the hopelessness of defense before a jury some of whom had purchased national lands, although no issue relating thereto was involved. In the present case the District Court, according to well-settled rules, was privileged to refer formally to its own records, and, for the purpose of advising ourselves with regard to the spirit of this statute, we can informally turn thereto. On doing so it might appear by proceedings in bankruptcy against Betts and Fisher that their dealings were very extensive, and, either through fraud or blundering on their part, very unfortunate. They dealt with a great many persons, ranging through many localities in the district of Massachusetts, and involving heavy losses. These facts illustrate the desirability of being able to purge the jury with reference to the numerous localities where this trial might stir up smouldering prejudices, thus emphasizing the necessity, under at least some

circumstances, of enlarging the number of challenges proportionately to the number of the different offenses alleged. Blackstone's Commentaries, vol. 4, 353, characterizes this privilege as involving "an arbitrary and capricious species of challenge"; and the learned author regards the law as protecting it not only for substantial reasons, but so that, in view of "sudden impressions and unaccountable prejudices," the prisoner may have assurance that the jurors stand unprejudiced, and that he may have a "good opinion" of them. However this may be, the purposes for which peremptory challenges are required are of such varied, unexpected, and sometimes unprecedented characters, that the inability to accomplish justice without them prohibits the courts from clipping the wings of the right to them beyond what the common law or the statute clearly requires.

Sometimes the best way to make certain of the falsity of a position is to sift the arguments proposed in its favor. The United States first urge the point of convenience. They say it was for the prisoner's convenience that the nine indictments should be tried together, and that the statute did not contemplate the impractical procedure which would enable him to challenge off at a single trial two juries and a half. The record does not show that Betts objected to the nine indictments being tried together. Perhaps he would have objected strenuously if he had understood that his right of peremptory challenge was thereby diminished. However, a question of convenience with reference to the construction of a statute is not to be determined by a single case. Mr. Justice Story, in United States v. Marchant, 12 Wheat. 480, 481, 6 L. Ed. 700 et seq., points out that when at the common law each person jointly indicted for a capital offense had a full right of challenging peremptorily, those accused sometimes found it convenient to be tried together and sometimes otherwise; and that the convenience involved in being tried together grew out of the multiplication of the number of challenges thus practically given. It is rarely either convenient or safe, or conducive to justice, for an accused person to be put on trial at the same time and before the same jury for a very large number of offenses, even of the same class. The point of convenience of the kind to which the United States thus refers bears as much against their contention as for it. It may be convenient for the United States, and undoubtedly assists in obtaining convictions, to put before a jury a mass of evidence bearing more or less pertinently on the whole group of alleged numerous offenses, which would not be admissible if only one were in issue; but experience has sometimes shown that the inconvenience to the accused coming therefrom rises to the danger point. Therefore, if this statute is to be construed according to the question of mere convenience, whose convenience are we to assume Congress intended to consult? It is true that, where a proposed construction would occasion great inconvenience, or produce an inequality or injustice, that construction is to be avoided if another and more reasonable interpretation is present in the statute. Knowlton v. Moore, 178 U. S. 41, 77, 20 Sup. Ct. 747, 44 L. Ed. 969; Bird v. United States, 187 U. S. 118, 124, 23 Sup. Ct. 42, 47 L. Ed. 100. The mere question between the right to challenge three jurors and the right to challenge two juries and a half, as put by the United States, is certainly not within

the meaning of the expression "great inconvenience." An inconvenience which controls the construction of a statute must be an inconvenience of such a kind as to force the court to find a reasonable interpretation in lieu of one which is unreasonable. Such an inconvenience as spoken of here is of such an inferior class that to attempt to determine whether Congress had it in mind is necessarily a matter of pure speculation.

Again, the United States declare impracticable a procedure which they say might give an accused person a right to challenge 150 jurors, and they urge anew that the statutes do not contemplate such an impracticable result. Even such a supposed extreme contingency involves nothing serious. If it did, it might well be maintained that, when Congress authorized several indictments to be tried together, it intended the right to challenge should be cut down as though there were but one; but, as no situation which can reasonably be anticipated approaches any condition of necessity, the theory of convenience or inconvenience pressed on us by the United States should properly be classed as one of those "too uncertain" things to justify resting thereon the judgment of a court in the interpretation of this statute. Bate Refrigerator Company v. Sulzberger, 157 U. S. 1, 37, 15 Sup. Ct. 508, 39 L. Ed. 601.

The next proposition of the United States on this score is that, inasmuch as on the trial of a single indictment the greater or smaller number of counts does not affect the right of challenge, the same reasoning applies to separate indictments when tried together. If in any case the United States see fit for reasons of their own to break up charges for numerous offenses into several indictments, instead of combining them into one, the person accused must, on the other hand, be protected in whatever advantages the law gives him by reason of such splitting up. This proposition of the United States is so plainly not a logical one that it clearly needs no further discussion.

The United States then cite several cases, of which one is Withers v. Commonwealth, 5 Serg. & R. 59. Although these decisions seem to go to the undisputed proposition that on a single indictment one set of challenges only is allowed, no matter how many counts it contains, Withers v. Commonwealth presses the law a little further, but not to any adjudicated proposition. Whatever the United States rely on therein is mere dictum. The United States then press the proposition that the intent of section 921 was to make one case of what formerly existed as several cases. This, we have shown, is clearly contrary to the letter of the statute and its spirit as applied to proceedings like those at bar.

The United States afterwards shift their position and rest on the direct proposition that the particular portion of section 819 covering challenges in misdemeanors is governed by the words "on the trial"; and they maintain, therefore, that, no matter how many indictments, yet, as there was here but one trial, it follows that there could be but a single set of challenges. They quote the following portion of the section: "On the trial of any other felony, the defendant shall be entitled to ten and the United States to three peremptory challenges; in all other cases, civil and criminal, each party shall be entitled to three

peremptory challenges; and in all cases where there are several defendants and several plaintiffs," etc. They then proceed: "A proper construction of the second clause [meaning the clause which we have quoted] is that upon the trial each party is entitled to three peremptory challenges, the phrase 'in all other cases' simply qualifying trial." They add: "The semicolon indicates that the thought is incomplete, and that the adverbial phrase is to be repeated." Thereupon they further say that the words "in all other cases, civil and criminal," should be interpreted as though they read, "On the trial, in all other cases civil and criminal." Then they conclude that, as the record shows there was but one trial, the case is governed by the letter of the statute as they claim it should be grammatically rearranged. It is so plain that this is a forced construction that we need make no observation about it, except to say that it is clearly met by Mutual Life Company v. Hillmon, 145 U. S. 285, 293, 12 Sup. Ct. 909, 36 L. Ed. 706, already referred to, and relied on by both parties. Such a construction necessarily means that under all circumstances, where cases have been ordered to be tried together, there can be but one set of challenges by all the proponents and one set of challenges by all the defenders; but Mutual Life Company v. Hillmon holds directly to the contrary for cases where suits against different defendants are ordered to be tried together under section 921 of the Revised Statutes.

The United States then proceed: "Suppose it be contended that there were nine trials in this case, or nine cases upon trial, yet the question is, how many defendants were there to this action?" The pertinency of this question is difficult to comprehend. The topic of the number of parties involved in such proceedings has been expressly disposed of by section 819 [U. S. Comp. St. 1901, p. 629] in connection with Mutual Life Company v. Hillmon. It in no way arises here, and it can throw no light on the case before us. In this connection, however, the United States maintain that Connecticut Mutual Insurance Company v. Hillmon, 188 U. S. 208, 23 Sup. Ct. 294, 47 L. Ed. 446, a continuation of the litigation in 145 U. S. 285, 12 Sup. Ct. 909, 36 L. Ed. 706, is favorable to their contention; but Connecticut Mutual Life Company v. Hillmon settled nothing, so far as we are concerned. There the trial court granted several sets of challenges, and the practical result was that its action in that respect was not disturbed. It is true that the Supreme Court did not touch the merits; consequently nothing was decided pro or con. Nothing was said even as dictum tending to sustain this position of the United States. The headnote at page 209, 188 U. S., page 294, 23 Sup. Ct., 47 L. Ed. 446, would lead to the understanding that the opinion states that the weight of authority is as claimed by the United States; but the opinion says nothing of the kind. The point before the trial court was the converse of what was decided by the Supreme Court in the earlier case. In the earlier case there were several distinct defendants in the various suits which were ordered to be tried together, and the Supreme Court held that, notwithstanding the cases were ordered to be tried together, each defendant was entitled to peremptorily challenge three jurors, to the same extent as though they had been tried separately. In Connecticut Mutual Insurance Co. v. Hillmon the trial court held that, inasmuch as there

were several distinct defendants in the original suits, though the same plaintiff in all, the plaintiff was entitled to several sets of peremptory challenges. Thereupon one of the defendants took out a writ of error to the Supreme Court. The opinion in behalf of that court observes (page 211, 188 U. S., page 295, 23 Sup. Ct., 47 L. Ed. 446), that the ruling of the trial court was the converse of the proposition established in the earlier case; but it held that under the circumstances the plaintiff in error was not prejudiced. It thus avoided the question before us.

The opinion in this case states at page 211, 188 U. S., page 295, 23 Sup. Ct., 47 L. Ed. 446, that the plaintiff in error cited a number of decisions in support of its construction of the statute, and it names one supposed to be to the contrary. We have examined the decisions cited, and we find that none of them bear on the question before us. After giving these citations, the opinion proceeds: "Conceding that the great weight of authority supports the proposition of the defendant, we are still of the opinion," etc. Thereupon the court disposed of the case as we have said. So far from stating, as said in the headnote, that the weight of authority was with the plaintiff in error, the opinion only conceded it for the purpose of argument. Thus a careful examination shows that the court decided nothing favorable to the United States with reference to the questions before us.

The truth is that there is no decision of the Supreme Court which can be held to be an adjudication of the question before us, and no expression from it, except what we have already quoted from Mutual Insurance Company v. Hillmon, 145 U. S. 285, 293, 12 Sup. Ct. 909, 36 L. Ed. 706, to the effect that by an order to try cases together "no defendant could be deprived without its consent of any right material to its defense, whether by way of challenge of jurors or otherwise." Within that expression, as we have already explained, the right asserted by the plaintiff in error by way of peremptory challenge was a "right material" to his defense; so that, therefore, if this citation could be regarded in its entirety as a definite ruling, it would be the end of this case. Assuming, however, that it cannot be so taken, we hold, as we have shown, that the right under discussion is a "right material" to the defense of the plaintiff in error, and that there is nothing in the positions submitted by the United States which requires us to interpret the language of the statutes to which we have referred as taking it away. Thus the United States not only fail to impress us that the statutes should be construed as they claim, but their propositions lead to the impression that, with all the ingenuity which their legal advisers possess, no satisfactory basis can be constructed by them.

We have not referred to section 1024 of the Revised Statutes [U. S. Comp. St. 1901, p. 720], which relates especially to consolidations of indictments. This section originated in 1853, while section 921 [U. S. Comp. St. 1901, p. 685] originated in 1813. So far as we can discover, both sections, under proper rules of construction, have full effect. So far as the topic we are discussing is concerned, section 1024 makes no provision for trying indictments together, but only that the court may order them to be consolidated. If this means anything more than was done in the present case, it certainly could have no just application to the indictments at bar. That section 1024 contemplates a proper con-

solidation may well be inferred from what has appeared in reference to it in the Supreme Court in Logan v. United States, 144 U. S. 263, 267, 296, 12 Sup. Ct. 617, 36 L. Ed. 429, and Williams v. United States, 168 U. S. 382, 18 Sup. Ct. 92, 42 L. Ed. 509. In McElroy v. United States, 164 U. S. 76, 77, 17 Sup. Ct. 31, 41 L. Ed. 355, 356, the opinion rendered by the Chief Justice in behalf of the Supreme Court, referring to section 1024, says: "The order of consolidation under this statute put all the counts contained in the four indictments in the same category as if they were separate counts of one indictment." This indicated that in the mind of the Supreme Court a proceeding under this section operated as a true consolidation. Therefore, in view of the special provisions of section 5480 [U. S. Comp. St. 1901, p. 3696], to which we have referred, proceedings on the indictments before us could not have been taken under section 1024, because so to do would be to defeat the letter and purpose of the statutory direction that only three distinct offenses should be included in one indictment. In In re Henry, 123 U. S. 372, 8 Sup. Ct. 142, 31 L. Ed. 174, it was held that section 5480 of the Revised Statutes did not prohibit the finding of several indictments each of which charged three distinct offenses within the same six months; but the Court of Appeals for the District of Columbia in Bass v. United States, 20 D. C. App. Cas. 232, 239, after reviewing In re Henry, held that several indictments found under that section could not be consolidated under section 1024. Therefore, finding for ourselves no occasion to question that the present proceeding was under section 921, we have followed the lead of each party in that respect.

Two decisions of the Circuit Court of Appeals in other circuits have been brought to our attention, namely, Stone v. United States, 64 Fed. 667, 12 C. C. A. 451, and Times Publishing Co. v. Carlisle, 94 Fed. 762, 36 C. C. A. 475. The earlier of the two cases seems to have gone off as did Connecticut Mutual Ins. Co. v. Hillmon, already referred to, the ruling being found on page 672, 64 Fed., page 455, 12 C. C. A. The case is not authority either way on the record before us. Times Publishing Co. v. Carlisle has weight in favor of the plaintiff in error, although the question before us was given such scanty attention that we do not feel justified in accepting the decision as authoritative. At page 780, 94 Fed., 36 C. C. A. 493, it sustains the position taken by the trial court, which was the same that was sought to be brought under review in Connecticut Mutual Insurance Company v. Hillmon, where a single plaintiff in three suits against different defendants, tried together, was allowed three full sets of peremptory challenges.

Without, however, considering further the decisions, we are satisfied that sound reasoning compels us to sustain the position that the plaintiff in error was entitled to three peremptory challenges on each indictment. While, therefore, we have questioned the proceedings in the District Court on other propositions, yet, being of the opinion that what observations we have made will render unnecessary any possible future application to us with reference thereto, we rest our conclusion on the fact that the District Court allowed the plaintiff in error only one set of peremptory challenges.

The judgment of the District Court is reversed, the verdict is set aside, and the case is remanded to that court for further proceedings in accordance with law.

ALDRICH, District Judge (dissenting). The several indictments against one and the same defendant relating to one and the same scheme to defraud, though technically presenting different cases because of different mailings of the same circular, were properly tried together under the order of court, and, being so tried, they became in every practical, substantial, and essential sense one case involving one trial. This being so, three peremptory challenges were all the defendant was entitled to. As a matter of substance, there is no greater reason for multiplying the challenges here than that which exists where similar charges are preferred in various counts in one indictment. Trying at one time the several indictments against a single defendant containing charges in respect to a single scheme to defraud based upon one and the same circular was in no way destructive of any substantial right material to the defense.

By order of court, and without objection, the cases, technically nine, though substantially one, were properly merged in one trial as one case. The object of the statutes authorizing such merger is to save expense and delay, and is as much in the interests of respondents as of the government. It would be a great hardship upon a respondent if criminal procedure conditions were such that he must be subjected to nine trials in a situation like that involved here.

The statutory right of three peremptory challenges "in all other cases" in terms applies as well to civil as to criminal cases. The idea of consolidation, or of an order that several cases shall be tried together, is always founded upon the fact that the cases involve substantially one controversy, and are, therefore, in a substantial and essential sense, one case. To so construe the statute in question as to preserve to each party in criminal and civil cases a peremptory right of full challenge in each of the cases merged for the purposes of one trial would defeat the object of the statute authorizing consolidation. Suppose it were a dozen civil cases, both parties exercising such rights under ordinary conditions would exhaust the panel and compel a continuance or a delay necessary to ordering new jurors, and all this without saving to the party or parties any substantial or essential right. The multiplied rule of 27 peremptory challenges under such circumstances as exist in this case would seriously obstruct the administration of the criminal law without saving to the respondent any substantial or beneficial right or advantage. The same would be true when the multiplied rule, if it obtains in criminal cases, shall be applied, as it logically and necessarily must be, to several civil suits tried together between private parties.

I cannot concur in the idea that Congress, in attempting to avoid delay and expense to parties by authorizing a trial, as one case, of cases technically several though essentially involving one controversy, intended to create a condition, both in civil and criminal cases, not upon grounds of reason or substantial justice, but through the right of mul-

tiplied peremptory challenges, which should defeat its purpose, and make the consolidated procedure more difficult of administration than that involved in the old procedure and the old way.